**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**SASWOT DHAKAL**,

        Plaintiff,

        v.

**FEDERAL BUREAU OF**
**INVESTIGATION**, *et al.*,

        Defendants.

Case No. 1:24-cv-02525 (TNM)

---

**MEMORANDUM OPINION**

Saswot Dhakal has launched repeated lawsuits based on his perceived persecution at the hands of the Federal Bureau of Investigation. This one travels under the Freedom of Information Act. Dhakal submitted a FOIA request demanding all FBI records pertaining to him. The FBI produced several pages in full and invoked FOIA and Privacy Act exemptions to partially redact others. It also made *Glomar* responses refusing to confirm or deny the existence of certain categories of documents. The Court holds that the FBI's search was adequate and that it properly applied the exemptions and *Glomar* responses. The Court will thus grant summary judgment for the FBI.

**I.**

Saswot Dhakal is a frequent filer in this district. *See* Compl., ECF No. 1, *Dhakal v. United States*, No. 24-cv-2056 (TNM) (D.D.C. July 16, 2024); Compl., ECF No. 1, *Dhakal v. United States*, No. 25-cv-1594 (TNM) (D.D.C. Apr. 26, 2025); Compl., ECF No. 1, *Dhakal v. FBI*, 25-cv-1345 (UNA) (D.D.C. Apr. 29, 2025). These lawsuits, including the present FOIA action, stem from Dhakal's belief that he is the "victim of severe and unlawful actions by the

FBI, ranging from torture to financial sabotage," as well as "repeated attacks on [his] due process rights and relentless attempts to sabotage [his] pursuit of justice."  Compl., ECF No. 1, ¶¶ 3–4. Dhakal views FOIA as "the sole avenue for obtaining critical information" about the FBI's alleged misconduct.  *Id.* ¶ 4.

To that end, Dhakal submitted a FOIA request to the FBI.  Hammer Decl., ECF No. 27-1, ¶ 6.  That request sought "any and all information [about himself] and what the FBI has perpetrated against [him]."  Hammer Decl. Ex. A, ECF No. 27-2, at 1.  In response to the request, the FBI conducted a search of its Central Records System ("CRS"), which yielded no responsive records.  Hammer Decl. ¶ 8.  A week later, Dhakal submitted another FOIA request asking for the same information.  *Id.* ¶ 10; Hammer Decl. Ex. E, ECF No. 27-2.  The FBI searched the CRS again and told Dhakal that there still were no responsive documents.  Hammer Decl. ¶ 11.

Dhakal appealed the FBI's responses to the Department of Justice's Office of Information Policy.  *Id.* ¶ 12.  The Office of Information Policy remanded the requests to the FBI, instructing the agency to conduct another search for responsive records.  *Id.* ¶¶ 13–14.  On remand, the FBI performed a third CRS search.  *Id.* ¶ 18.  That search produced responsive records "in a file regarding civil suits and/or administrative claims," but the FBI told Dhakal that the records were exempt from disclosure under FOIA Exemption 5, 5 U.S.C. § 552(b)(5), and Privacy Act Exemption (d)(5), 5 U.S.C. § 552a(d)(5).  *Id.*

By this time, Dhakal had filed a pro se FOIA action in this Court.  *Id.* ¶ 17.  After learning of Dhakal's suit, "the FBI conducted another review of the records located and withheld."  *Id.* ¶ 19.  The agency then "made its final release of records to [Dhakal], advising that 16 pages of records were reviewed, and 15 pages of records were being released in full or part,

with certain information exempted pursuant to Privacy Act Exemptions (d)(5) and (j)(2), 5

U.S.C. § 552a(d)(5) and (j)(2), and FOIA Exemptions 5, 6, 7(C), and 7(E), 5 U.S.C. § 552(b)(5),

(b)(6), (b)(7)(C), and (b)(7)(E)." *Id.* The FBI "also asserted a *Glomar* response with respect to

unacknowledged documents comprising: national security or foreign intelligence

records, . . . records identifying persons in the Witness Security Program; . . . records identifying

individuals on a watchlist; and . . . records whose release could reasonably be expected to

endanger the life or safety of a confidential human source." Defs.' SMF, ECF No. 27-3, ¶ 11.

The FBI has moved for summary judgment, and that motion is now ripe.[1]

## II.

To obtain summary judgment, a movant must show that "there is no genuine dispute as to

any material fact" and that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court credits the nonmovant's factual allegations and draws all reasonable inferences in his

favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he vast majority of

FOIA cases can be resolved on summary judgment . . . ." *Brayton v. Off. of the U.S. Trade

Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

"[A]n agency responding to a FOIA request must conduct a search reasonably calculated

to uncover all relevant documents and, if challenged, must demonstrate beyond material doubt

that the search was reasonable." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)

(cleaned up). To withhold records, the agency must "reasonably foresee[] that disclosure would

harm an interest protected by" a FOIA exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I). The agency

---

[1] Dhakal's brief was largely "written by chat gpt [sic]." Pl.'s Opp'n, ECF No. 30, at 1. The parts that Dhakal wrote himself "contain[] highly abusive language targeted at this Court." Order to Show Cause, ECF No. 32, at 1; *see* Pl.'s Opp'n at 1. This "language is completely unacceptable in a court of law." Order to Show Cause at 1.

bears the burden of showing that the exemption applies. *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). Even when it carries that burden, the agency must release "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b).

Although *pro se* litigants are held to less stringent standards than those applied to formal pleadings drafted by lawyers, they must still comply with the Federal Rules of Civil Procedure. *See Yellen v. U.S. Bank, Nat'l Ass'n*, 301 F. Supp. 3d 43, 46–47 (D.D.C. 2018).

### III.

This FOIA case raises a hodgepodge of classic issues: (1) whether the FBI conducted an adequate search; (2) whether it properly applied various FOIA and Privacy Act exemptions; (3) whether it properly invoked certain *Glomar* responses; and (4) whether the FBI released all reasonably segregable information. The Court addresses each issue in order.

### A.

Adequacy is up first. When prompted by a valid FOIA request, the agency "must conduct a search reasonably calculated to uncover all relevant documents." *Truitt*, 897 F.2d at 542 (cleaned up). The agency need not "search every record system" or track down every document. *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Instead, the agency must demonstrate that it performed a good-faith search "using methods which can be reasonably expected to produce the information requested." *Id.* It can carry that burden with an affidavit "setting forth the search terms and the type of search performed[] and averring that all files likely to contain responsive materials . . . were searched." *Id.*

Dhakal asked the FBI for "any and all records pertaining to himself." Hammer Decl. ¶ 6; *see also* Hammer Decl. Ex. A at 1. To fulfill that request, the FBI turned to the CRS—"an

4

extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files." Hammer Decl. ¶ 21. The CRS "spans the entire FBI organization and encompasses the records of FBI Headquarters, FBI field offices, and FBI legal attaché offices worldwide" *Id.* "[T]he key to locating records within the [CRS's] enormous amount of information" are the general indices, which are like "a digital version of a library card catalog." *Id.* ¶ 23. The general indices contain two types of entries: "main index entr[ies] . . . for each individual or non-individual (e.g., organization, event, or activity) that is the subject or focus of an investigation;" and "reference index entr[ies] . . . for [each] individual or non-individual . . . associated with an investigation, but who or which is not the main subject or focus of the investigation." *Id.* ¶¶ 24–25.

The FBI decided "that a search of the CRS automated indices . . . represented the most reasonable means for the FBI to locate records potentially responsive to" Dhakal's FOIA request. *Id.* ¶ 29. Accordingly, "the FBI conducted a search for main and reference entries" using the terms "Dhakal, Saswot" and "Saswot Dhakal." *Id.* ¶ 30 (footnote omitted). This unearthed one responsive file "relat[ing] to a tort claim submitted by [Dhakal] to the FBI." *Id.* ¶¶ 30, 34. The FBI saw "no basis . . . to conclude that a search elsewhere would reasonably be expected to locate responsive records." *Id.* ¶ 31.

The FBI has done enough on adequacy: It has established that its search was "reasonably calculated to uncover all relevant documents." *Truitt*, 897 F.2d at 542 (cleaned up). As the agency has shown, the CRS indices are the likeliest place to contain records about Dhakal—and no other location would reasonably harbor more. Courts (including this one) have routinely blessed this showing in similar cases. *See, e.g.*, *Callimachi v. FBI*, 583 F. Supp. 3d 70, 85 (D.D.C. 2022) ("Given the breadth of the CRS and that names of individuals are reasonably

likely to be indexed, a search of those indexes was reasonably likely to find records about [the relevant individual]." (cleaned up)); *Cunningham v. DOJ*, 40 F. Supp. 3d 71, 85 (D.D.C. 2014) (upholding FBI's CRS index search for records about an individual). The Court follows suit here.

Via his artificially intelligent counsel, Dhakal complains that the FBI's "declarations omit critical details." Pl.'s Opp'n at 3. This argument does not hold water. Dhakal asserts that the FBI did not explain "whether both main and cross-reference indices were queried." *Id.* That is plain wrong. *See* Hammer Decl. ¶ 30 ("In response to [Dhakal's] request, the FBI conducted a search for main and reference entries . . . via Sentinel's search function." (footnote omitted)). Dhakal also speculates about other "likely systems," "potentially responsive email or other electronic repositories," and "homonyms, aliases, and variant identifiers." Pl.'s Opp'n at 3. But he offers no reason why any of those locations or unspecified search terms would yield responsive documents. *See Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996) ("The agency is not required to speculate about potential leads"); *Callimachi*, 583 F. Supp. 3d at 85 ("To overcome the FBI's showing of adequacy, [the plaintiff] must provide evidence that other databases or searches are reasonably likely to contain responsive records." (cleaned up)). Dhakal thus fails to undermine the search's adequacy.

**B.**

Next consider exemptions. The FBI invoked several—including FOIA Exemptions 5, 6, 7(C), and 7(E), as well as Privacy Act Exemptions d(5) and (j)(2). Hammer Decl. ¶ 19. The Court concludes that all were justified. It discusses each in turn.

**1.**

FOIA Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "[T]he parameters of Exemption 5 are determined by reference to the protections available to litigants in civil discovery . . . ."  *Burka v. HHS*, 87 F.3d 508, 516 (D.C. Cir. 1996).  Exemption 5 thus sweeps in the attorney-client privilege and work-product doctrine.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).  The FBI invokes both as to the same material.  Defs.' SMF ¶¶ 17–18.

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice," as well as "communications from attorneys to their clients if the communications rest on confidential information obtained from the client."  *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) (cleaned up).  "In the governmental context, the 'client' may be the agency[,] and the attorney may be an agency lawyer."  *Id*.  Meanwhile, the work-product doctrine "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories."  *Coastal States Gas Corp.*, 617 F.2d at 864.  It protects materials prepared by an attorney in anticipation of litigation.  *See Nat'l Ass'n of Crim. Def. Lawyers v. DOJ Exec. Off. for U.S. Att'ys*, 844 F.3d 246, 250–51 (D.C. Cir. 2016).

The FBI shows that both protections apply.  It explains that the responsive file "was compiled as part of the FBI's administrative duties performed in reviewing, analyzing, and responding to a tort claim against the FBI by [Dhakal]."  Hammer Decl. ¶ 48.  In producing the responsive records, the FBI redacted "details within an electronic communication between FBI general counsel and FBI employees (their clients) . . . that reflect the seeking and/or providing of

7

legal advice." *Id.* ¶ 45. Specifically, the withheld material comprised "the preliminary evaluation of [Dhakal's] tort claim." *Id.* This falls squarely within the attorney-client and work-product protections under Exemption 5. *See Tax Analysts*, 117 F.3d at 618; *Coastal States Gas Corp.*, 617 F.2d at 864.

That leaves foreseeable harm. "To withhold a responsive record, an agency must show both that the record falls within a FOIA exemption . . . and that the agency 'reasonably foresees that disclosure would harm an interest protected by [the] exemption.'" *Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). To clear that bar, the agency "must identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials." *Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (cleaned up).

The FBI has done so here. It explains that producing the material "would call into question [its] commitment to withhold confidential information shared between agency clients and attorneys and could dissuade agency attorneys and clients from fully sharing such information." Hammer Decl. ¶ 45. Releasing privileged information also "would provide advantage to individuals seeking legal action against the government and/or those targeted for prosecution by the government." *Id*. The FBI further avers that disclosing attorney work product "would interfere with government attorneys' ability to properly prepare their legal theories and strategies and hinder them in providing the best possible representation of their clients." *Id*. ¶ 47. From that explanation, the Court concludes that the FBI has demonstrated a foreseeable harm sufficient to sustain Exemption 5. *Accord Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021) ("[A]n agency's burden under the foreseeable harm requirement may be more easily met when invoking" the attorney-client and

8

"other privileges and exemptions for which the risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated.").

**2.**

Move on to Exemptions 6 and 7(C), both of which are about privacy. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) covers "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). Because "Exemption 7(C) is more protective of privacy than Exemption 6," the Court "need only consider whether [the FBI] properly invoked Exemption 7(C)." *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011) (cleaned up). "To meet its burden of establishing that Exemption 7(C) applies, the agency must demonstrate that (1) disclosure could reasonably be expected to constitute an unwarranted invasion of privacy and (2) the personal privacy interest is not outweighed by the public interest in disclosure." *Elec. Priv. Info. Ctr. v. DOJ*, 18 F.4th 712, 718 (D.C. Cir. 2021) (cleaned up).

The FBI relied on Exemptions 6 and 7(C) to withhold "the names of FBI professional staff . . . assigned to . . . tasks related to the handling of [Dhakal's] administrative tort claim." Hammer Decl. ¶ 53. Its justification satisfies Exemption 7(C)'s demands.

On Exemption 7(C)'s initial step—requiring that records be "compiled for law enforcement purposes"—the FBI meets its burden. *See* 5 U.S.C. § 552(b)(7). It describes itself as "the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency." Hammer

9

Decl. ¶ 48.  The FBI maintains that "the responsive record herein was compiled as part of the FBI's administrative duties performed in reviewing, analyzing, and responding to a tort claim against the FBI by [Dhakal]."  *Id.*  The agency further reasons that "[a]lthough this record is administrative in nature, the tools and techniques used to handle this type of claim are also used for the FBI's law enforcement function."  *Id.*  This suffices to make it past Exemption 7's threshold.  *See Campbell v. DOJ*, 164 F.3d 20, 32 (D.C. Cir. 1998) ("Because the FBI specializes in law enforcement, its decision to invoke exemption 7 is entitled to deference."); *see also Pinson v. DOJ*, 313 F. Supp. 3d 88, 114 (D.D.C. 2018) ("[W]here there is no ongoing investigation, materials may still meet [Exemption 7's] threshold requirement if they are akin to 'guidelines, techniques, and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation.'" (quoting *Tax Analysts v. IRS*, 294 F.3d 71, 78 (D.C. Cir. 2002)).

On Exemption 7(C)'s next hurdles—that disclosure would result in an unwarranted invasion of privacy from which the FBI "reasonably foresees" harm—the FBI has also shown enough.  *See Machado Amadis*, 971 F.3d at 370 (cleaned up); *Elec. Priv. Info. Ctr.*, 18 F.4th at 718.  The relevant information comprised "the names of FBI professional staff . . . handling [Dhakal's] administrative tort claim."  Hammer Decl. ¶ 53.  The declaration explained that "[t]hese FBI employees could be targeted for reprisal based on their involvement in specific investigations/investigative activities, including situations where an individual alleges certain actions occurred and resulted in personal injury or harassment."  *Id.*  In contrast to these "substantial privacy interests," the FBI discerned "no public interest" in "disclosing the identities of these FBI employees to the general public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities."  *Id.*  Nor

10

does Dhakal assert any public interest. *See* Pl.'s Opp'n at 4. The Court thus concludes that the FBI has fulfilled Exemption 7(C)'s requirements and demonstrated a foreseeable harm.

**3.**

Exemption 7(E) shields "records or information compiled for law enforcement purposes, but only to the extent that" their release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The D.C. Circuit has "set[] a relatively low bar for the agency," requiring it only to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (Kavanaugh, J.) (cleaned up).

For the same reasons as above, the FBI clears Exemption 7's threshold of having "compiled" the relevant records "for law enforcement purposes." 5 U.S.C. § 552(b)(7); *see supra* Part III.B.2. The agency also meets the exemption's other demands—including foreseeable harm. The FBI "withheld the non-public telephone numbers of an employee of the FBI's Office of General Counsel." Hammer Decl. ¶ 57. "Releasing this non-public telephone number would provide criminals with specific targets for attacks on FBI communications through 'spoofing' or other illegal means." *Id.* (footnote omitted). Criminals "could use social engineering to gain further unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to investigate, solve, and prevent crimes by disrupting the FBI's internal communications." *Id.* ¶ 58. These concerns amply justify applying Exemption 7(E). *See Blackwell*, 646 F.3d at 42; *see also, e.g., Curry v. FBI*, No. 18-cv-0439, 2024 WL 21466, at *4

(D.D.C. Jan. 2, 2024) (ruling that FBI properly withheld internal phone numbers under Exemption 7(E)).

**4.**

That leaves the Privacy Act. "Unlike FOIA, the Privacy Act's primary purpose is not disclosure." *Blazy v. Tenet*, 194 F.3d 90, 96 (D.C. Cir. 1999). The Privacy Act instead aims to "safeguard[] the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records." *Bartel v. FAA*, 725 F.2d 1403, 1407 (D.C. Cir. 1984). It allows an individual "to participate in ensuring that his records are accurate and properly used, and by imposing responsibilities on federal agencies to maintain their records accurately." *Id.* (cleaned up). To facilitate that participation, the statute requires agencies to grant a requesting individual "access to his record or to any information pertaining to him which is contained in" the agency's "system of records." 5 U.S.C. § 552a(d)(1).

Like FOIA, the Privacy Act contains multiple exemptions to its separate disclosure mandate—of which the FBI invoked (d)(5) and (j)(2). Hammer Decl. ¶ 19. The Court finds both valid.

Exemption (d)(5) covers "any information compiled in reasonable anticipation of a civil action or proceeding." 5 U.S.C. § 552a(d)(5). It "protects documents prepared in anticipation of quasi-judicial administrative hearings" as well as "actions in the district courts." *Martin v. Off. of Special Couns., MSPB*, 819 F.2d 1181, 1188 (D.C. Cir. 1987). "[T]he reasonableness of a party's anticipation of litigation is measured by . . . the objective probability that litigation will be initiated." *Mobley v. CIA*, 924 F. Supp. 2d 24, 62 (D.D.C. 2013) (cleaned up).

The FBI explains that the responsive file "relates to a tort claim submitted by [Dhakal] to the FBI." Hammer Decl. ¶ 34. When the FBI created that record, it reasonably anticipated

litigation to be impending.  After all, administrative claims like Dhakal's are a precondition to suing under the Federal Tort Claims Act.  *See* 28 U.S.C. § 2401(b).  Dhakal has vindicated the FBI's expectation by filing his many suits.  *See supra* Part I.  Exemption (d)(5) thus applies here for similar reasons as FOIA Exemption 5.  *See supra* Part III.B.1.

Then there is Exemption (j)(2).  It authorizes agencies "to exempt any system of records" if that system is "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws" and contains law enforcement records.  5 U.S.C. § 552a(j)(2).  The FBI has deployed that authority to exempt the CRS from Privacy Act disclosures.  *See* 28 C.F.R. § 16.96(a)(1).  The responsive record here was in the CRS—and thus is exempt under (j)(2).  *See, e.g.*, *Puzey v. DOJ*, No. 21-cv-2096 (CRC), 2025 WL 660820, at *2 (D.D.C. Feb. 28, 2025) (ruling that Exemption (j)(2) applied because "all of the FBI's responsive records were found by searching its Central Records System").

## C.

Turn now to *Glomar*.  In certain cases, "the fact of the existence or nonexistence of agency records falls within a FOIA exemption."  *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).  This is where agencies may provide a *Glomar* response—"refus[ing] to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a[] FOIA exception."  *Id.* (cleaned up).[2]  When reviewing such a response, "courts apply the

---

[2]  The name stems from the *Glomar Explorer* Project, "a classified CIA program supposedly undertaken to raise a sunken Soviet submarine from the floor of the Pacific."  *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981).

general exemption review standards established in non-*Glomar* cases." *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021) (cleaned up).

The FBI made four *Glomar* responses to Dhakal's request. Second Hammer Decl., ECF No. 27-2, ¶ 3. Each was proper.

*First*, the FBI issued a *Glomar* response as to "national security or foreign intelligence records pursuant to FOIA Exemption 1 and Exemption 3, in conjunction with 50 U.S.C. § 3024(i)(1)." *Id.* That response serves "to protect certain records the FBI may or may not have compiled while carrying out its responsibilities to investigate threats to the national security and to gather foreign intelligence." *Id.* ¶ 7.

Exemption 1 carves out records "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy." 5 U.S.C. § 552(b)(1). Exemption 3 covers documents "specifically exempted from disclosure by statute[s]" that "require[] that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or . . . establish[] particular criteria for withholding or refer[] to particular types of matters to be withheld." *Id.* § 552(b)(3). Meanwhile, the National Security Act of 1947 provides that "[t]he Director of National Intelligence shall protect, and shall establish and enforce policies to protect, intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(h)(1). And by executive order, the FBI is authorized to "refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." *Classified National Security Information*, Exec. Order No. 13526, 75 Fed. Reg. 707, 718–19 (Dec. 29, 2009).

14

Taken together, the National Security Act and Executive Order 13526 amply justify the FBI's *Glomar* response under Exemptions 1 and 3.  *See, e.g.*, *Schaerr v. DOJ*, 435 F. Supp. 3d 99, 113 (D.D.C. 2020) (endorsing agency's *Glomar* responses relying on Exemptions 1 and 3); *see also Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 53 (D.D.C. 2015) ("Importantly, when a *Glomar* response touches upon issues of national security—'a uniquely executive purview'—courts must give agency decisions substantial deference." (quoting *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012)).

*Second*, the FBI invoked *Glomar* as to "records which could identify a participant in the Witness Security Program."  Hammer Decl. ¶ 63.  That response relied on Exemption 3 "in conjunction with 18 U.S.C. § 3521(b)(1)(G)."  *Id.*  Under that statute, the Attorney General may promulgate regulations to bar the disclosure of any "matter concerning" the Witness Security Program after weighing certain factors.  18 U.S.C. § 3521(b)(1)(G).  In turn, the Attorney General has issued a regulation forbidding disclosure of those materials unless certain high-ranking officials direct it.  28 C.F.R. § 0.111B(b).  Given these authorities, the Court greenlights the FBI's *Glomar* response.

*Third*, the FBI refused under Exemption 7(E) to confirm or deny "the existence of an individual's name on a watch list."  Hammer Decl. ¶ 63.  As the agency explains, its "records concerning terrorist watchlists were compiled and created in furtherance of [its] law enforcement and national security functions."  Second Hammer Decl. ¶ 25.  It further maintains that "[d]isclosure of the existence or non-existence of watchlist records in response to a request for records on an individual 'would disclose techniques and procedures for law enforcement investigations' and . . . 'could reasonably be expected to risk circumvention of the law.'"  *Id.* ¶ 26 (quoting 5 U.S.C. § 552(b)(7)(E)).  Indeed, "[i]f an individual knows who is or is not on a

15

watchlist, they can understand what types of behavior are pertinent to placement on a watch list." *Id.* And "[t]his knowledge would allow criminals to develop countermeasures to conceal their activities and thwart efforts to combat crime and protect the national security of the United States." *Id.* In light of this declaration, the Court concludes that the FBI's *Glomar* response meets all of Exemption 7(E)'s demands. *Accord Rhodes v. FBI*, 316 F. Supp. 3d 173, 177–78 (D.D.C. 2018).

*Fourth*, the FBI made a *Glomar* response as to "unacknowledged records or information . . . concerning the use of confidential human sources . . . in the context of a specific investigation." Second Hammer Decl. ¶ 28. It invoked FOIA Exemptions 7(D), 7(E), and 7(F). *Id.* Exemption 7(D) shields law enforcement records whose disclosure "could reasonably be expected to disclose the identity of a confidential source, . . . and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). Exemption 7(E) is familiar by this point. Meanwhile, Exemption 7(F) allows agencies to withhold law enforcement records whose disclosure "could reasonably be expected to endanger the life or physical safety of any individual." *Id.* § 552(b)(7)(F).

The FBI raises several harms that this *Glomar* response prevents. In its telling, acknowledging the existence or non-existence of records "would endanger FBI [confidential human sources] as the FBI's FOIA responses would create a pattern whereby criminals could easily discern who is and is not an FBI [confidential human source]." Second Hammer Decl. ¶ 30. Disclosure would also "indicate an unwillingness on the part of the FBI to take appropriate measures to ensure the safety and confidentiality of its [confidential human sources]" and thus

16

"would dissuade current and future sources from providing critical, law enforcement relevant information to the FBI." *Id.* Likewise, "[e]xperience has shown that when identifying information concerning [confidential human sources] becomes known, that disclosure places [them] in a particularly vulnerable position and subjects [them] to violent retaliation through physical harm or even death." *Id.* ¶ 34. The Court finds that this explanation satisfies all three exemptions. In sum, then, all four *Glomar* responses were proper.

**D.**

Last up: segregability. FOIA mandates that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "[D]istrict courts cannot approve withholding exempt documents without making an express finding on segregability." *Machado Amadis*, 971 F.3d at 371 (cleaned up). In making that assessment, courts give agencies "a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

To sustain that presumption, "the agency must provide a detailed justification for [the exempt material's] non-segregability" but need not "provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (cleaned up). It is sufficient for the agency to provide an affidavit attesting to its "line-by-line review of each document withheld in full" and its determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," paired with a *Vaughn* index describing the withheld records. *Id.* (cleaned up); *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (ruling that "the

description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" were "sufficient for [the segregability] determination").

The FBI clears the bar.  It explained that, "[f]ollowing its line-by-line, page-by-page segregability review, [the FBI] determined 8 pages could be released in full . . .; 7 pages could be released in part with minimal redactions per the identified FOIA exemptions cited herein because these pages comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages."  Hammer Decl. ¶ 60.  The agency also withheld one page in full "because it was a duplicate."  *Id.*  Finally, the FBI provided a *Vaughn* index that documents these determinations.  *See* Hammer Decl. Ex. N, ECF No. 27-2.  Binding precedent demands nothing more.  *See Johnson*, 310 F.3d at 776.

**IV.**

Because the FBI prevails on all fronts, the Court will grant summary judgment for the agency.[3]  A separate Order will issue today.

Dated: March 20, 2026

TREVOR N. McFADDEN
United States District Judge

---

[3]  To the extent that Dhakal's opposition asks for other forms of relief, those requests are denied. *See* Pl.'s Opp'n at 2.  The Court previously denied Dhakal's request for court-appointed counsel, and it does so again now.  *See* Min. Order 3/31/2025; LCvR 83.11(b)(3).  Given its ruling on the merits, the Court also rejects Dhakal's bids for in camera review and additional discovery.